Filed 8/24/20  In re W.G. CA4/2

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| In re W.G. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E074791 |
| Plaintiff and Respondent, | (Super.Ct.No. J279105) |
| v. | OPINION |
| J.C., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, Jodi L. Doucette, Outside Counsel, for Plaintiff and Respondent.

1

J.C. (Mother) and S.G. (Father[1]; collectively, Parents) are the parents of A.G. (female, born 2013) and W.G. (male, born 2015; collectively, the children). On appeal, Mother challenges the summary denial of her Welfare and Institutions Code[2] section 388 petition. For the reasons set forth *post*, we shall affirm the trial court's order denying Mother's section 388 petition.

## FACTUAL AND PROCEDURAL HISTORY

### A.   BACKGROUND FACTS

On December 13, 2018, Mother went to work and left W.G. in the care of her boyfriend, F.A. Mother and Boyfriend had been together for five months. The other child, A.G., was in school. Boyfriend called Mother and told her he found W.G. burned in the bathtub. Boyfriend stated that "it was an accident; I didn't do it on purpose." Boyfriend sent Mother pictures of W.G.'s burn. Mother told Boyfriend to take W.G. to the hospital but he convinced her it was not a good idea because she would get her children taken away and he would go to jail. Mother did not leave work, she continued working. When she came home from work, she again told Boyfriend they should take W.G. to the hospital. Again, Boyfriend convinced her not to seek medical care for W.G. Mother was concerned about losing Boyfriend; he paid her car payment. The next day, Boyfriend admitted pouring a cup of boiling water on W.G. Then, when W.G. cried, Boyfriend poured more boiling water and called W.G. a "crybaby."

---

[1]  Father is not a party to this appeal.

[2]  All further statutory references will be to the Welfare and Institutions Code unless otherwise specified.

Mother informed Father about the incident the following day. Father cared for the children every weekend. Father asked Mother to keep W.G. away from Boyfriend but did not ask that W.G. be taken to the hospital. Three days later, Father saw W.G. Father became tearful because of the pain W.G. endured, but did not take W.G. to the hospital or ask Mother to take him. Father did not contact law enforcement.

On December 18, 2018, W.G. continued to be fussy and in pain. He still was not eating. Mother went to get her hair done and asked the maternal grandmother (MGM) to watch W.G. MGM did not take W.G. to the doctor. When Mother showed her hairstylist pictures of W.G., the hairstylist called CFS about the incident. When Mother returned from her hair appointment, she took W.G. to St. Mary's Hospital because a scab on W.G.'s penis reopened and started to bleed. Dr. Vikram Raj, the treating physician, determined the injuries to W.G. were nonaccidental, and reported the incident. W.G. was transported to Arrowhead Regional Center's Burn Unit. The right side of his face was burned, and he had cigarette burns on his body and face; he had surgery for skin grafts.

B.     DETENTION AND SECTION 300 PETITION

On December 18, 2018, the children were removed from the care of parents pursuant to a detention affidavit. A.G. was placed with a maternal granduncle (foster father) and grandaunt (foster mother; collectively, foster parents). The plan was for W.G. to be placed in the same home once he was discharged from the medical burn clinic. The foster mother worked for CFS as a supervisor in the Barstow division.

On December 21, 2018, CFS filed section 300 petitions for serious physical harm, and failure to protect or seek medical care. As to W.G., the petition was filed under

3

section 300, subdivision (a)(1), (b)(2), (b)(3), (b)(4), (e)(5), (e)(6), (g)(7), and (i)(8). As to A.G., the petition was filed under section 300, subdivision (g)(1), (j)(2), and (j)(3). The petitions alleged that W.G. was physically abused because 23 percent of his body was covered in burns, which included cigarette burns, and neither parent obtained proper medical care for him. The children, therefore, were at risk of harm.

On December 24, 2018, at the detention hearing, the juvenile court read and considered CFS's detention report and its attachments. The court then found that there were no other reasonable means to protect the children without court intervention and detention out of the home of the parents. Parents were awarded supervised visitation once per week for two hours with the children. Preplacement services were also offered to parents. Parents were advised that reunification services may be denied because of the seriousness of the allegations. The court set a jurisdiction and disposition hearing for January 11, 2019.

C.     JURISDICTION AND DISPOSITION HEARINGS

On January 19, 2019, CFS filed its first amended section 300 petitions.

In the jurisdiction and disposition report dated January 11, 2019, CFS recommended finding the allegations in the petitions as true, denying family reunification services due to the severity of the injuries and the parents failing to seek timely and necessary medical care, and placing the children with the foster parents permanently.

In the report, the social worker reported that W.G. was interviewed at the Children's Assessment Center (CAC) by the social worker and law enforcement. The social worker asked W.G. about the burn scar on his face. Initially, W.G. shut down; he

4

put his head down, was sad, and had tears in his eyes. He asked for his foster father. W.G. then stated that he had other "owies" on his private part and pointed to it, and on his back. He stated that Boyfriend caused the injuries, and that he cried when Boyfriend poured hot water on his body. W.G. stated he told Mother.

According to A.G., while she was at school, Boyfriend gave W.G. the "owies." She denied that Boyfriend abused her to the social worker. A.G., however, told law enforcement that Boyfriend "smacked my butt." She also stated that Mother hit her.

Mother stated that on December 13, 2018, Boyfriend called her at work and was hysterical, claiming that the injuries to W.G. were an accident. She video-chatted with Boyfriend and saw the burns but stayed at work. Mother claimed that she told Boyfriend to give W.G. some medication and to take him to the hospital. Boyfriend talked Mother out of seeking medical care because he would get in trouble and Mother would have the kids taken away. She did not take W.G. to the hospital when she got home.

The next day, Boyfriend admitted that he had poured hot water on W.G. in the bath and W.G. started to cry. Boyfriend then poured more water on W.G. because Boyfriend thought W.G. did not like baths.

On December 15, 2018, MGM saw the burns and inquired about them. Mother stated that she was not taking W.G. to the hospital because she feared the arrest of Boyfriend and the loss of her children. The next day, Mother sent the maternal aunt a picture of W.G.'s burns. Mother also video-chatted with her sister; the sister told Mother to take W.G. to the doctor. Mother did not.

5

On December 17, 2018, Father saw the burns on W.G. Although Father was angry at Boyfriend and cried, Father did not take W.G. to seek medical care. He also did not tell Mother to take W.G. to a medical professional.

The next day, the scab on W.G.'s penis opened and began to bleed. Mother left W.G. with MGM and then went to get her hair done.

The social worker noted that Mother admitted she and Boyfriend had been together for five months. During the first month of their relationship, Boyfriend punched the wall during an argument and made a hole in the wall. Mother stated that Boyfriend was diagnosed as bipolar and had depression. Mother had a history of domestic violence in a prior relationship where her ex-boyfriend was arrested. As a result of the current events, Mother was booked in jail and had a pending willful child endangerment charge for most of the CFS case.

On January 4, 2019, the social worker interviewed Father. Father admitted that he did not seek medical care for W.G. even after Father saw the injuries and was shocked when he saw W.G.'s burns. When Father took A.G. to school, he dressed W.G. for the car ride. Father admitted that W.G.'s pants were sticking to his skin because of the burns. Father stated that he did not tell any family members about what happened because he feared that they would lose the kids. Father had previously asked W.G. about Boyfriend. W.G. stated that he was afraid of Boyfriend and would cry. W.G. asked Father not to return him to Mother after staying with Father for the weekend.

CFS recommended reunification services be denied. The social worker requested a section 366.26 hearing be scheduled, and an adoption assessment be prepared.

The jurisdiction and disposition hearing was continued until February 28, 2019 because the CAC forensic medial exam report and police report had not been completed. The CAC report was not completed because W.G. was still in the hospital.

On February 28, 2019, the social worker provided an updated report that included 400 pages of medical documents. Mother had been attending counseling but the report from the counselor lacked information related to the reason for custody. Moreover, although CFS received W.G.'s medical reports, the police report and the forensic report were not completed yet. Therefore, the hearing was continued for April 11, 2019.

At the hearing on April 11, 2019, CFS submitted an updated report. In the report, the social worker stated that W.G. had surgery for undescended testicles and one testicle had to be removed. The parents were still in counseling, but the CAC had not yet completed a forensic medical exam and the police report had not been submitted. The hearing was continued until May 11, 2019.

On May 8, 2019, Dr. Siccama completed the CAC forensic medical exam. The police report, however, was still not submitted. In the CAC report, Dr. Siccama noted that W.G.'s wounds were from being "held in place," consistent with the boyfriend's statement that he poured scalding water on W.G. "until he noticed his skin began to come off" and thought he was defecating in the tub. Dr. Siccama determined that W.G. was in serious pain and that Mother and Father prolonged the child's pain by failing to get him medical care. Dr. Siccama also determined that W.G. had "widespread scarring" with life-long effects. W.G. also had cigarette burns at different stages of healing. The doctor

7

noted that W.G. presented at the hospital with hyponatremia and hypokalemia due to fluid loss from delayed care for the burns.

When CAC interviewed W.G., he appeared happy and playful. However, when W.G. was questioned about his injuries, he became extremely upset, emotional and tearful. He asked for his foster father. W.G. did not ask for Mother or Father.

Because the police report had not been filed, the hearing was continued to June 12, 2019.

CFS filed its addendum report dated June 12, 2019, which included the police report. Mother told the detective that on the day of the incident, right after she arrived at her work, Boyfriend called her over 16 times and texted her 13 times within a half a hour. Boyfriend was watching W.G. at this time. Boyfriend cussed and swore at her and became increasingly abusive and angry because Mother was not answering her phone. Boyfriend believed that she was too busy talking to other men to answer his calls. Boyfriend's fury escalated. He threatened to leave Mother, and to leave W.G. at home alone. During this time, Boyfriend burned W.G.

Mother told the detective that Boyfriend had been emotionally abusive to W.G.— calling him a "crybaby," "pussy," "fag," and "gay." Mother admitted that Boyfriend had a history of domestic violence in their home and punched a hole in the wall of their bedroom. Mother was aware of Boyfriend's anger issues and that W.G. was afraid of Boyfriend. She, however, continued her relationship with him and took no action.

Regarding the incident, Mother told MGM that she and Boyfriend "agreed on everything," and both agreed not to take W.G. to the hospital. In a text, Mother stated

8

that she did not want to call the cops on Boyfriend "as what's that gonna do besides put me in more debt because he is taking over the Nissan payment." Mother recalled seeing a suspicious bruise on W.G.'s ears and knew that he was afraid of Boyfriend. Moreover, Mother admitted that she knew that Boyfriend lost custody of three of his children.

A search of Boyfriend's phone via a search warrant revealed an image of a juvenile with his pants down on October 25, 2018; Boyfriend lived with Mother and her children during this time. The juvenile's bottom was red, swollen and injured. The juvenile resembled W.G.

A.G. described the boyfriend hitting Mother and Mother crying. A.G. also stated that Mother left A.G. and W.G. alone at home when Mother went to the store.

Mother and Boyfriend were charged with willful cruelty to a child, a felony. They were arrested and taken into custody.

In the updated report, CFS noted that Mother attended counseling and parenting classes since January 23, 2019. The children were doing well in their foster home.

The hearing was continued to June 19, 2019, to take testimony and to obtain the psychological evaluation of Father.

At the hearing on June 19, 2019, the juvenile court read and considered the social worker's addendum report and other CFS reports, the police report, the CAC report, the psychological evaluation of Father, and the other attachments.

Mother conceded the amended petition's section 300, subdivision (a) allegation. She, however, denied having prior knowledge of Boyfriend's propensity to harm her child, the section 300, subdivision (b) allegation. Mother also denied the section 300,

9

subdivision (c) allegation. She claimed that she had been working on services. Mother's counsel admitted that the section 300, subdivision (i) injuries were serious, but denied that Mother had knowledge about the cigarette burns before detention. Counsel also argued that Mother's cooperation with law enforcement should be considered.

The juvenile court found all the jurisdictional allegations as true in the amended petition. Specifically, the juvenile court stated that the "failure to seek medical attention on its own is enough evidence, frankly, beyond a reasonable doubt." The court also noted the detention report's description of the "social worker's contact with W.G. and how obvious it was to her that he was in extreme pain and kind of gasping because of the pain, and that's after the child was seen by medical professionals." The court stated: "I can only imagine what he was like before that, and for five to six days and at least a couple of days when dad was aware of it. His reaction to those injuries, that he was crying when he saw [W.G.], demonstrates that he knew just how horrible his son was injured—how horribly his son was injured and that he was in extreme pain. [¶] The mother let that go on for far too long, and in fact went to get her hair done instead of worrying about the fact that her child was in this pain."

Later in the day, the disposition hearing continued with testimony from the psychological evaluator, Dr. Kinsman, as to Father. The hearing was continued to July 24, 2019, to obtain a psychological examination of Mother in addition to other testimony.

At the July 24, 2019 disposition hearing, the parties stipulated to Dr. Kinsman's psychological report of Mother being admitted into evidence. Although Dr. Kinsman

10

was present and ready to testify, no testimony was requested by the parties. Mother did not testify. No additional evidence was admitted.

Mother's psychological exam noted that Mother had generalized anxiety disorder, and apparent "Narcissistic and Antisocial Personality features." Dr. Kinsman stated that Mother was narcissistic, immature, manipulative, and impulsive; oriented toward self-gratification; inclined to take risks; and made "efforts to conceal mistakes and to appear more competent than she feels." As to Mother's ability to self-report, Dr. Kinsman wrote: "The mother exhibits rigidity and inflexibility in her approach to problems and may not be open to psychological self-evaluation. She's likely to project an exceptionally positive self-image and is intolerant of other's feelings."

In the report, Dr. Kinsman determined that Mother's "children's welfare and safety have not been her paramount consideration." He stated that providing services to Mother for a minimum of one year would be necessary to prevent the re-abuse of the children.

The juvenile court, after reading and considering the psychological reports of both parents, the social worker's report of July 24, 2019, other CFS reports, the police reports, and the CAC opinion and attachments, declared the children dependents of the court. The court found that the children's out-of-custody placement was necessary to protect harm, that the parents' efforts have been insufficient to mitigate the reasons for removal, that reunification services are to be denied under section 361.5, subdivision (b)(5) and (b)(6), and a permanent placement hearing under section 366.26 should be set to consider the termination of parental rights. The court stated that the "likelihood of the children

11

being returned safely within 12 months with no continuing supervision is zero." The court then denied reunification services to both parents. The court stated that Mother's failure to provide for the medical care of W.G. was due to her own selfish reasons. The court reduced visits to twice per month, supervised. The court then set a section 366.26 hearing for November 20, 2019.

On August 2, 2019, Mother and Father filed writs to challenge the setting of a section 366.26 hearing. Mother filed a no-issue writ statement. On September 26, 2019, we dismissed the writ. Mother also filed a Notice of Appeal on August 2, 2019.

On September 25, 2019, the educational rights of the children were transferred to the foster parents.

Prior to the section 366.26 hearing scheduled for November 20, 2019, CFS recommended that parents' rights be terminated, and a permanent plan of adoption be implemented. The children were doing extremely well and had made "huge" improvements in their placement with the foster/prospective adoptive parents—their great maternal uncle and aunt. W.G. was still in burn garments and had to have his left testicle removed. He had nightmares and cried in his sleep, requiring a lot of rocking and consoling. W.G.'s temper tantrums reduced. A.G. continued with speech therapy and counseling. Like W.G., A.G.'s temper tantrums reduced. Moreover, A.G.'s "parentification" of W.G. improved. When A.G. was asked about how A.G. felt about staying with her foster parents until she was grown, she jumped up and down with excitement and stated, "I want to stay here." The children sought out their foster parents for comfort, nurturing, and any other needs.

Mother continued to visit the children, twice per month. There were issues regarding structure, routine and supervision. The foster parents arranged for contact with the children and the other relatives at soccer games, birthday parties, and other family activities, as long as the children were supervised.

Pursuant to further noticing issues with the Indian Child Welfare Act, the section 366.26 hearing was continued to January 29, 2020. On January 29, 2020, the hearing was continued to April 14, 2020.

In the interim, on January 28, 2020, Mother filed a section 388 petition requesting that (1) reunification services be provided for six months for Mother; and (2) other relatives be assessed as prospective adoptive parents. In support of her section 388 petition, mother attached five exhibits which included: (1) completion certificates for parenting classes; (2) a letter from Mother's counselor dated November 13, 2019, stating that Mother had completed 16 sessions and parenting classes—information that had been provided prior to the June 19, 2019, hearing; (3) a psychological evaluation by Dr. Kinsman that was submitted and considered by the court at the July 24, 2019, disposition hearing; (4) criminal court notes indicating that Mother pled guilty to willful cruelty to a child violation and she received work release; and (5) photographs of Mother with the children.

On January 29, 2020, the court summarily denied the section 388 petition, stating that the proposed change of order did not promote the best interest of the children. On February 21, 2020, Mother filed a timely notice of appeal from the summary denial of her petition.

**DISCUSSION**

Mother argues that the juvenile court abused its discretion by summarily denying her section 388 petition without a hearing because there was prima facie evidence that circumstances were changed and granting the petition was in the children's best interest.

Under section 388, a juvenile court order may be changed or set aside "if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) "[I]f the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition." (*Ibid.*; § 388, subd. (d) ["If it appears that the best interests of the child . . . may be promoted by the proposed change of order, . . . the court shall order that a hearing be held"].) The prima facie requirement is not met "unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*Zachary G.*, at p. 806.) We review the court's order denying a hearing for abuse of discretion. (*Id.* at p. 808.) "It is rare that the denial of a section 388 motion merits reversal as an abuse of discretion." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 522 (*Kimberly F.*).)

In this case, Mother argues that her circumstances had changed because "[a]lthough mother had completed a parenting course, a domestic violence course, and sixteen weeks of therapy sessions prior to the disposition hearing, she completed more programs after the disposition hearing. [Citation.] Those subsequent programs included

14

two more parenting courses, more domestic violence classes, and more individual therapy with a different therapist." Moreover, a letter from the recent therapist confirmed that Mother had helped in the prosecution of her former boyfriend for the burn injuries to W.G. "Also, mother acknowledged her mistakes in handling the burn incident and she accepted responsibility for what happened to [W.G.]."

We need not decide whether the juvenile court erred in finding there was no prima facie showing of changed circumstances because even if even Mother provided sufficient evidence of changed circumstances, she did not meet her burden of showing that granting her section 388 petition was in the children's best interests.

Parent and child share a fundamental interest in reuniting up to the point at which reunification efforts cease. (*In re R.H.* (2009) 170 Cal.App.4th 678, 797, disapproved on another ground in *John v. Superior Court* (2016) 63 Cal.App.4th 91, 98-100.) By the point of a section 366.26 hearing to select and implement a child's permanent plan, however, the interests of the parent and the child have diverged. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 254.) Therefore, after reunification efforts have terminated or bypassed, as in this case, the court's focus shifts from family reunification toward promoting the child's needs for permanency and stability. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) This is a difficult burden to meet when reunification services have been bypassed or terminated. This is because, "[a]fter the termination of reunification services [or bypass of services], a parent's interest in the care, custody and companionship of the child is no longer paramount." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464 (*Angel B.*).) In fact, there is a rebuttable presumption continued

foster care is in the child's best interest. (*Ibid.*) Such presumption applies with even greater strength when adoption is the permanent plan. (*Ibid.*)

In *Angel B.*, *supra*, 97 Cal.App.4th 454, the court affirmed a juvenile court's ruling that denied a mother a hearing on her section 388 petition based on findings that the mother failed to make the requisite prima facie showing of changed circumstances and that the proposed change in custody was in the child's best interest. The *Angel B.* court reasoned that, "there was no evidence that Mother was ready to assume custody of Angel or provide suitable care for her; while she had completed the drug program, the time she had been sober was very brief compared to her many years of drug addiction (a concern expressed by the social worker), and in the past she had been unable to remain sober even when the stakes involved were the loss of her other child. Nor was there evidence that she had a housing situation suitable for Angel, or any arrangements for child care while she worked. And . . . there was no evidence that Angel preferred to live with Mother rather than with the foster family." (*Angel B.*, at p. 463.) In addition, "a primary consideration in determining the child's best interest is the goal of assuring stability and continuity. [Citation.] When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role. [Citation]. That need often will dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child." (*Id.* at p. 464.) The court in *Angel B.* noted that the burden of proof "is a difficult burden to meet in many cases, and particularly so when, as here, reunification services have been terminated or never ordered. After the termination of reunification services, a parent's interest in the care,

16

custody and companionship of the child is no longer paramount. [Citation.] Rather, at this point, the focus shifts to the needs of the child for permanency and stability." (*Ibid.*)

Here, as in *Angel B.*, Mother failed to make a showing that granting mother's section 388 petition was in the children's best interest. As provided above, when "reunification services are terminated (or, as in this case, never ordered in the first place), the focus of the proceedings changes from family reunification to the child's interest in permanence and stability." (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1163.) In this case, the juvenile court did exactly what is mandated by law—it focused on the children's permanence and stability.

In this case, at the time Mother filed her section 388 petition, January 28, 2020, six months after services were bypassed, the children's interest in stability was the juvenile court's foremost concern, outweighing any interest in reunification. The prospect of allowing both children to be placed in Mother's care, or increasing visits, or providing Mother with reunification services to see if Mother would and could do what she was required to do to regain custody would not have promoted stability for the children, and thus would not have promoted the children's best interest. (*Angel B.*, *supra*, 97 Cal.App.4th at p. 464.) As noted *ante*, by the time Mother filed her section 388 petition, W.G. was five years old and A.G. was seven years old, and had been in a stable, relative prospective adoptive home for two years. During this time, Mother initially had weekly supervised visits with the children, which was later changed to twice monthly supervised visits. The visits were never changed to unsupervised visits. The foster/prospective adoptive parents—a great-maternal- aunt and uncle—assumed full parental

17

responsibilities and care for the children by the time of the hearing on the section 388 petition, including educational responsibilities. CFS stated that there was no doubt that the children and the foster/prospective adoptive parents were strongly bonded with each other. The foster/prospective adoptive parents were addressing the children's dental and medical needs, had them in therapy, registered W.G. in preschool, had A.G. in speech therapy, involved them with sports and other extracurricular activities. W.G. had nightmares and cried in his sleep; his foster/prospective adoptive parents provided lots of rocking and consoling to calm him. The children went to the foster/prospective adoptive parents for comfort and for their needs and viewed them as their parental figures. A.G. was thrilled to hear that she could stay with them.

Based on the foregoing, the juvenile court did not abuse its discretion in summarily denying Mother's section 388 petition without a hearing.

## DISPOSITION

The juvenile court's order summarily denying Mother's section 388 petition is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER_____

J.

We concur:

McKINSTER_____

        Acting P. J.

FIELDS_____

        J.